May it please the court. My name is Robert Peck. I'm here on behalf of the City of Los Angeles. I hope to reserve five minutes of my time for rebuttal. The City of Los Angeles commenced this action because it had evidenced the Bank of America had failed to extend credit to minority home buyers on equal terms to non-minority. When? When did they do this? When did the bank do this? Yeah. We allege that it was continuous since 2004. To date? To date. Okay. The bank, the district court granted the bank's motion for summary judgment on the statute of limitations issue. In doing so, the court used the wrong test and reached the wrong conclusion. Each of its rulings were built on the rocky foundation of that erroneous view of the statute of limitations. The district court required the city to show that the discriminatory loans were issued and went to foreclosure and cost the city money all within that two-year limitation period. That it could not refer back to those loans that occurred before that period, and that the city essentially had to prove its entire case, liability, injury, and damage with respect to the events within that two-year period in order to be able to invoke the continuing violation analysis. That was wrong. A statute of limitations measures time from when a claim occurs. Let me just see if I can understand how this is set up. So the complaint, as you just answered Judge Hawkins' question, alleged practice is going back to 2004. Yes. Correct? But the statute of limitations is only two years. The statute of limitations is two years from the last occurrence. Right. So when did you file your complaint? 2013. So we go back two years. That's the statute of limitations, correct? Yes. So when you start, anything prior to the two years and the start of the statute of limitations is technically out. It's technically out until we show. Just listen to me for a minute. It's technically out, right? Uh-huh. Okay. So your task is, oh, we got it. In order to prove our disparate impact case, we need to take a look at a substantial number of loans and whatnot. We need to prove an impact case, not a disparate treatment case. And so you're looking at a broader range of information and data and whatnot. Is that right? Well, with respect to prove your case on the merits. To prove our case on the merits, we have to look at the vast body of loans. Yes. Okay. So your complaint, though, raises a key issue of statute of limitations because you've alleged all these prior activities. Correct? Yes. So the way you get over it is with the continuing violations doctrine. That's correct. Right? Yes. Okay. So as I understand from the litigation, you set this case up. You agreed to focus initially on whether or not you could establish a continuing violation. Yes. Right? Uh-huh. And so you agreed to limit your discovery to that period of time. That's correct. Correct? Okay. So when these motions were filed, when the bank filed this motion, the Supreme Court had not yet decided inclusive communities. Is that right? That's correct. Okay. So the district court didn't — the bank didn't have the advantage of that, you didn't have the advantage of that, and neither did the district court. Is that right? That is correct. Okay. So — but we do know that under Havens and Morgan, you could attempt to use the statute of limitations issue. Right? That's correct. Okay. So what, in your view, did you have to show to demonstrate to the court that the continuing violations doctrine applied in this context? We had to show that the behavior of the bank offering unequal terms to minority borrowers continued. And we could show that by demonstrating that loans of the kind that were in the body of prior to the statute of limitations period were continued to be given out by the bank to minority borrowers on terms that we alleged and our regression analysis could identify as being different from what would be offered to non-minorities. So — So that's the discriminatory practice continuing. Now, in the motion, you focus on basically HFA loans and on high-cost loans. Is that correct? I think that was more in the Wells Fargo case than in the — I'm sorry. What did you focus on in your case there? Well — I apologize because they overlap. I know. I do. And I have the same difficulty. But FHA loans and high-interest and interest-only loans were essentially what we focused on. That's correct in this case. Okay. So your claim is that the bank was issuing those loans over an extended period of time. What we were saying was that they were offering different terms to minorities than to similarly situated, credit-worthy non-minorities over time, and that the loan themselves don't matter. It's the discriminatory practice of the unequal terms. So now it's the discriminatory difference in the terms of the loans, which is the — No. — which is the practice that you're trying to — What we're trying — — say is the disparate impact? What we're saying is that the loans that go into a disparate impact analysis are those that have been offered to minorities that are more expensive or riskier than those that would be offered to non-minorities. And so the specifics of the loans matter less than the fact that these were unequal terms. So what's the cause of this? And the cause, we say, are the financial incentives that were given to loan officers, the marketing policies of the bank, and that sort of thing that created an incentive to give these higher-cost loans when they could get away with it. And, of course, as Inclusive Communities tells us, unconscious prejudice, you know, stereotyping — covert stereotyping is the term they use. And that sort of thing is what goes into disparate impact analysis. And that is the gravamen of a disparate impact claim. So one of the practices you reference is failure to monitor. Yes. How could that possibly be a — Well, if the bank has noticed that there is a disparate impact going on, as they did because there were public studies that showed that that was the case, then they had an obligation to do something about that. That's the cause of the disparity? We say that that was one of many. We cited 60 different policies of the bank that we thought contributed to the disparate impact. So, again, the focus really has to be on whether the bank's behavior essentially was continuous. In fact, in the city of Miami case, the 11th Circuit said it's not the loans themselves that matter. The loans can change over time. It is the behavior of the bank in basically using these incentives to create more expensive loans and riskier loans for minority borrowers. In fact, the district court in this case recognized that to be the case when it decided the motion to dismiss issue. But it seemed to abandon that issue when it got to summary judgment. Well, you changed your damage theory, didn't you? No, we did not. Okay. Throughout the case, we claimed that there were loss of property, tax revenues, and costs to the city, both in terms of remediation and its fair housing interests. Let me ask another question. Were you able to show or did you show that the practices of the bank prior to the limitations period were the same as the practices in the limitation period to take advantage of a continuing violation theory? We did. We did. We used an expert evidence for that purpose. Ian Ayers, who is a law professor and business professor at Yale and also served as the expert for the Department of Justice in their action against the banks, did a regression analysis to show that controlling for 20 different other characteristics to try to explain the other than race. He found that with respect to the high interest rate loans, for instance, there were the FHA loans, there were even just looking at the limitations period loans, there was three times more likelihood that an African American would receive one of those loans than a similarly creditworthy non-minority, that a Hispanic would receive it two times more frequently. With respect to the high interest loans, they were eight times more likely. I mean, that's something that... When you talk about FHA, and maybe I'm confusing this case with the Wells Fargo case a little bit, but when you look at FHA, I mean, how does that have an adverse impact or disparate impact on racial or ethnic grounds as opposed to social economic grounds? You know, the whole purpose of FHA was to help lower income across the board. But it has quite a history, as I understand it. And we don't deny that. But consider it this way, and this is the way the city looked at it. You have a minority borrower who goes in asking for a loan on a $200,000 house. They are steered to an FHA loan, which has up-front mortgage insurance premiums and other kinds of mortgage insurance premiums as well. The up-front premiums are folded into the loan, making the loan larger, and therefore changes the loan to a value ratio and other costs. Does it make any difference if the government requires those added charges? No, it does not. Why not? Because, here's the reason. If a non-minority borrower goes into the same bank with the same credit profile, asks for the same kind of loan on a $200,000 house in the same neighborhood, and gets a conventional loan, then their costs are going to be less, and that is discrimination. It doesn't matter whether it's a conventional loan. Both are offered conventional loans. If one gets a higher rate or more onerous terms, then that's discrimination, and that discrimination is ---- Pursuant to a bank policy? Again, because the ---- Excuse me. Yes. Did the Bank of America or Countrywide have a policy of doing what you just described? We, we, we ---- Part with a yes or no? We would say that it does not have any nationwide policy, but we had confidential witnesses in our complaint that said that they were pushed by branches to do this, and that we also said that the financial incentives, a larger loan means a larger financial reward to the loan officer. A push from a branch doesn't sound to me like a bank policy, and that was my question. Well, what I'm saying is for disparate impact purposes, the fact that there is a policy that's neutral on its face but that encourages this behavior is sufficient. That's what inclusive communities held. Well, I talked about a robust cause. I'm sorry? Talk about ---- Robust. The Court was very concerned about causation. The same allegations were made in the Miami case, which the Supreme Court just recently upheld, and so therefore, obviously, they met the robust causality requirement by simply that ---- Well, not yet. At the pleading stage, they did. Well, but the Court emphasized that when it goes back down, they've got to, you know, show a causal connection between the alleged improper practices and the discriminatory impact. And because I represented Miami in the Supreme Court, too, we are confident we can meet that. But even so, let me say that the fact is that this is enough of a connection for purposes of saying that the behavior continued, and at least for statute of limitations purpose, the city met its burden. Okay. I see that I'm running out of time. Do you want to pause and hold a little time for rebuttal? Yes. Thank you. Thank you. Okay. For the appellee, is it Mr. Heffernan? Yes, Your Honor. Good morning, and may it please the Court. Thomas Heffernan for the defendants. The fundamental problem, and we saw it even just in Mr. Peck's argument just now, the fundamental problem that the City of Los Angeles had is it simply didn't offer evidence in connection with the summary judgment motion, which was sufficient to show that it had stated a claim. And while their theories were basically the same, a continuing violation, for example, there was no evidence of what the conduct was prior to the time period. Well, take me back, if you will, to the structure, the way in which the parties agreed to move this case through the district court. So in other words, you initially agreed at some point after you lost the motion, after the district court ruled against you on the motion to dismiss, you agreed to a phased discovery and a phased approach, basically. Is that correct? Yes, although we asked the district court to actually order that and stay all other discovery, and the district court refused to do that. So the parties informally prioritized the statute of limitations discovery, but we didn't have a formal stay of any sort. Was there an agreement that there would be a motion for summary judgment on the statute of limitations, or was there going to be a motion for summary judgment on the entire claim? In fact, there was not only an agreement to file a summary judgment motion, but actually Judge Anderson, when he refused to put a stay pending summary judgment, set a separate early deadline for that motion. For which motion? For a motion just focusing on statute of limitations or focusing on the merits of the claim? Just statute of limitations. So sort of an out-of-order summary judgment. Let's not wait until the due. So during the ‑‑ why did they have to prove during the limitations period, if all they had to do was show a continuing violation was appropriate here, why did they have to prove the merits of an adverse impact case within the statute of limitations period in order to get the advantage of the continuing violation doctrine? They have to show discriminatory housing practice, which is a practice in violation of one of the substantive terms of FHA, which for us is the financing section, 3605. And in order to establish that, they had to come forward with evidence showing that there was a violation. What they did was they came up with Professor Ayer's report, which took on the burden of showing that, in fact, there was a disparate impact causal relation with the policy, all within that two‑year period. So they actually took on that burden and said, we're going to provide that based upon those two years. So I thought their task was, and I'm just trying to understand how this case was structured, I thought their task was to show that there's a genuine tribal issue of fact on whether or not they could invoke the continuing violations doctrine in order to move forward with the case. In other words, not that they had to prove the merits of their case, but only that they had to show there was a factual dispute with regard to the continuing violation, to utilizing the continuing violations doctrine. They had, that's correct, in Rule 56, they had to show there was a tribal issue of fact, that the lawsuit was timely. Right. One of the elements is they had to show that there was at least one loan that violated the statute, at least one practice that violated the statute. A practice. A practice. Right. Within that period. The other thing they had to show was that they were aggrieved. You can't bring a lawsuit unless you're aggrieved, and the city, which requires injury. Well, that sort of gets to the merits, because the theory of their case was an adverse impact case. That's correct, but it doesn't get to the merits. So how do you prove, I mean, you don't approve, it's very difficult. You know, in the Title VII case, it's extremely difficult to prove like a hostile work environment case with just one act of sexual harassment or something. You need a path, you need a. . . Correct. So if their theory of the case is adverse impact and they need to go back and scoop up all this information in order to prove an adverse impact, why do they have to prove with one incident, one loan that that constitutes an adverse impact? Don't they just have to show that they were using the same policies and practices over a period of time? There's several different ways they could have chosen to prove an adverse impact. They chose to restrict it to the loans and practices within the two-year time frame. They didn't. . . What did they show with respect to prior practices and procedures? Absolutely zero. You're not just saying that it was insufficient. You're saying they didn't prove anything at all. Nothing at all. Nothing at all. They chose to argue that, well, Mr. Peck indicated, they chose to base it upon the two-year time period. Right. And so there was no evidence about what happened prior to the two years and there was no evidence of an injury, none at all. And as a result, they were not aggrieved and they didn't have Article III standing to move forward with their case. Is it your position that just hypothetically and generally that if a lending institution engages in practices that create a high rate of foreclosure and a lot of houses become foreclosed and even abandoned, that that doesn't produce damage or injury to the municipality which has to clean it up, provide increased police protection, et cetera? To the extent the city has a proprietary interest, for example, in not spending money, then they would be able to state a claim, assuming they could prove it, including the causal connection, which would be difficult. So you're acknowledging that there could be damage to the city from disparate loan practices creating a high rate of foreclosure, but that didn't happen here. That's what you're saying. It didn't happen here because there was no evidence offered and they didn't come up with a 56D affidavit saying they needed time to develop that evidence. And so instead they chose to. But that gets back, and I guess I'm going around in circles and I'm sorry, but it gets back to what the focus of the motion was about. The way you're telling me it was supposed to be focused on whether or not they could rely on the continuing violations doctrine. And what you're saying is in order to do that, they had to prove with one loan that that was a discriminatory impact. That's impossible. I don't know. I don't think that's. That's what you just said a minute ago. Okay. Well, then if I did, I'm sorry for misstating. The real problem for them is they have to appoint to practices or policies that overlap. And what he did when he stood up there, what he said was, I asked him about failure to monitor. Well, how could that possibly be a causal connection? And we agree with that, that that is not the robust causality that Justice Kennedy had in mind. What instead has to happen is the plaintiff in a situation like this has to zero in on a policy which it can demonstrate, a factual issue at least, cause the disparity which the statistics demonstrate. Did the district court in granting summary judgment in favor of your clients say that the summary judgment was limited to the issue, was limited simply to the issue of the ability of the plaintiff to prove a continuing violation? No. Or did it go to the merits? What the court found was that there was no timely claim because they had not come up with a timely injury which was necessary to support the claim. So in that sense, it's like Garcia v. Brockway, where you have a violation but there was no timely aggrievement within the two years. And the same was true here. The city came up with no evidence at all to show that they had a timely injury and therefore they could pursue a claim. And the court had warned in its motion to dismiss opinion that when it came for summary judgment, it was going to require specific facts. And now we know from the comments the court made at the end of the opinion that the court was somewhat skeptical and was throwing out a marker in its dismissal opinion saying we're going to have to come up with specific facts. And the city chose not to do that. Just from the way I see the way the case was structured, if the motion was only focused on the statute of limitations and the whole case is about disparate impact, the only way they could make a case out is to invoke the continuing violations doctrine. Well, that's not the merits of the case. Judge Pius, that wasn't the approach the plaintiffs took. The city took the approach that they were going to demonstrate disparate impact based upon only conduct within the two-year timeframe after the suit was filed. But the conduct, what they're saying is the conduct relates back. You know, it just continues on. It's just this conduct is just continuing on from 2004 until the time we file our lawsuit. That is what they allege. They didn't offer any evidence at all about what the actual conduct was within that two-year time period, within the period prior to limitations. All right. And, again, I mean, what Judge Anderson had before him was an argument that there was not a timely claim, which requires a discriminatory housing practice, which was the evidence of this disparate impact, and aggrievement because you can't bring a lawsuit if you're not aggrieved under the statute. And the city did not come up with any evidence at all that it had suffered an injury within the two-year period or ever. They alleged things, but they didn't come up with any evidence. They did not seek a 50-60 affidavit saying they needed more time. They did not say to the court on summary judgment when we argued injury and aggrievement, they didn't say to the court, don't decide that. This is not a statute of limitations issue. This is a merits issue. They didn't say that. You look at the briefs below. They fully engaged on the issue of damage. They just said they didn't have to show it. They didn't suggest that it was improper for the court to reach it. And the court indicated, both as a matter of the statute and as a matter of Article III, that it can't go forward because there's not a timely claim. And so that was really the difficulty that the court had. The court chose not to go on the issue of whether there was a discriminatory housing practice. In other words, it chose not to pursue that line. And Judge Wright, in the Wells Fargo case, chose to do that. So there were really two elements, and Judge Wright decided on the issue of whether there was an injury. That's going to be whether there was a violation. And Judge Anderson, in my case, decided on whether or not there was an injury. So there was no evidence of any injury, and the only thing they came up with ultimately was they argued that the city has an interest in ensuring residents are free from housing discrimination. Well, you see, I mean, I don't quite understand what Judge Anderson did by relying on injury, because, you know, it's pretty clear that the city, as a result of the Supreme Court's recent case just a couple of weeks ago or a week ago, that they fall, their claim falls within the zone of interest of the FHA. And they can go ahead with their claim, whether on the merits they can prove a causal connection, as Justice Kennedy says. Or Breyer, I guess it was, says. It's a whole other question. But this seems to – strikes me what happened here is there seems to be a collapse between the statute of limitations and continuing violation doctrine and the merits of the case. And it seems like it's all got kind of convoluted in some way. Well, again, when we went and briefed statute of limitations, we argued both issues. We argued there's no timely claim. And in order to have a timely claim, you need to have a violation, and you need to have a lawsuit by somebody who's aggrieved within two years. You have to have an allegation of a violation. You have to have an allegation. But then when it comes time for summary judgment, you have to prove it. You have to show that there's a disputed issue of travel, issue of fact, that there is a violation and a travel issue of fact that there's a change. Well, let me take this – let me do this another way. So if you're – if the motion is about statute of limitations, and you say, oh, we survived the statute of limitations because of the continuing violation doctrine, what did they have to show under Morgan, under Havens, under Ninth Circuit cases in order to get the benefit of that doctrine? In order to show a discriminatory housing practice, okay? They would have to show some conduct. Continuing violation presumably would be a continuation of the prior conduct into the limitations period for at least a little bit. That's what they would have to show to get the benefit of those principles. Did they do that here? No. They didn't for several reasons. First of all, again, they offered no evidence at all of what happened prior to 2011. Secondly, this is not a proper case for the continuing violation doctrine in any event. And you see that by looking at Havens, which is the case they rely on. In Havens, the court said, we're going to recognize continuing violation for what they refer to as the neighborhood claim. People have been injured by not living in an integrated neighborhood. But then in the same paragraph, they rejected the idea that individuals who had been discriminated against when they applied for an apartment could bring an untimely lawsuit simply because there was further denials of other people's claims in the middle of the limitations period. So the court recognized, and Morgan is another case where the court recognized it, that continuing violation doesn't apply wouldn'tly. It only applies in those circumstances like the neighborhood claim or like hostile work environment. And it cannot be used to take a series of individual discriminatory activities and stitch them together and therefore you can bring a claim based upon the benefit of the continuing violation doctrine. But in any event, there was no evidence of that. And again, I would just return to the fact that the district judge was asked to decide whether there was a timely claim. And we argued there was not a timely claim because there was no discriminatory housing practice and there was no timely injury. And the city did not complain that that was not something the court should decide and the court decided it. And they actually don't even tell this court that that was error for the court to decide that. And in any event, take a step back. And I think what you have to ask yourself is why is the city being permitted to bring a lawsuit in federal court when at the time of summary judgment it can't show one iota of evidence of harm? No further questions from the panel? I appreciate your time. Hearing no questions, thank you. Mr. Peck, you have some final thoughts. Thank you, Your Honor. I think it's important to point out that we did not just ask for damages, but we also asked for injunctive relief. And so, therefore, proof that we suffered damages within that period of time also did not make this an untimely lawsuit. In response to your question, Judge Hawkins, you said that there was no evidence that anything occurred from the prior pre-statute of limitations period. The judge did not want to hear that. And in the opinion below, the court said that even if I were to consider that, that does not make the current issues timely. So he did not want to consider anything from prior. He wanted the entire case tried for that two-year period. And we think that that's wrong. In Havens, for example, we had five instances of a tester, of testers going and asking for an apartment that was available and told that it wasn't available. Four of those instances were by the same tester, but all were outside the 180-day statute of limitations that existed at that time. One tester asked during the limitations period, and the court said that that constituted a continuing violation allowing the nonprofit organization Homes, which was a plaintiff in the case, to bring the action. So these were not discrete activities. This was a continuing violation of the same behavior that basically placed on minorities more expensive and riskier loans than they otherwise qualified for. That is the discriminatory conduct that continued. That's why the continuing violation analysis applies under the statute of limitations text of the statute and under Havens. And that's why solely one loan, without having to prove disparate impact, is enough to show that there was a violation. Roberts. Do you seek to reach back prior to 08-09? Yes, we do. And your theory is that the practices prior to the financial crisis of 08-09 are the same during the limitations period? That's correct. As the 11th Circuit noted, while the type of the- I have your answer. Okay. I have your answer. Thank you. And you're going to get some more time on the next case. Yes.  Thank you. We thank both counsel for very nicely presented arguments. And the City of L.A., L.A. Bank of America case shall be submitted.
judges: Hawkins, Gould, Paez